IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| KIMBERLY BEEMER and ROBERT MUISE,<br>Plaintiffs,<br><br>v.<br><br>GRETCHEN WHITMER, in her official capacity as Governor for the State of Michigan, DANA NESSEL, in her official capacity as Attorney General of the State of Michigan, and BRIAN L. MACKIE, in his official capacity as Washtenaw County Prosecuting Attorney,<br>Defendants. | No. 1:20-cv-00323<br><br><br>Hon. Paul L. Maloney<br><br>U.S. Magistrate Judge Phillip J. Green<br><br><u>ORAL ARGUMENT REQUESTED</u> |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS**

---

AMERICAN FREEDOM LAW CENTER
Robert J. Muise, Esq. (P62849)
P.O. Box 131098
Ann Arbor, Michigan 48113
(734) 635-3756
rmuise@americanfreedomlawcenter.org

David Yerushalmi, Esq. (Ariz. Bar No. 009616;
DC Bar No. 978179; Cal. Bar No. 132011;
NY Bar No. 4632568)
1901 Pennsylvania Avenue NW, Suite
201Washington, D.C. 20006
(646) 262-0500
dyerushalmi@americanfreedomlawcenter.org

*Attorneys for Plaintiffs*

Michigan Department of Attorney General
Joseph T. Froehlich (P71887)
Joshua Booth (P53847)
Christopher Allen (P75329)
John Fedynsky (P65232)
Assistant Attorney General
525 West Ottawa Street, P.O. Box 30754
Lansing, Michigan 48909
(517) 335-7573
froehlichj1@michigan.gov

*Attorneys for Defendants Whitmer and
Nessel*

Miller, Canfield, Paddock and Stone PLC
Sonal Hope Mithani (P51984)
Joel C. Bryant (P79505)
101 North Main, Seventh Floor
Ann Arbor, Michigan 48104
(734) 668-7786
Mithani@millercanfield.com

*Attorneys for Defendant Mackie*

## TABLE OF CONTENTS

<strong>Page</strong>

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF FACTS ................................................................. 2

LIFTING THE PANDEMIC VEIL ...................................................... 8

STANDARD OF REVIEW ............................................................... 11

    A.    Rule 12(b)(1)........................................................... 11

    B.    Rule 12(b)(6)........................................................... 12

ARGUMENT ................................................................................ 12

I.    The Pandemic Does Not Empower the Governor to Infringe Fundamental Rights nor Does It Deprive this Court of Its Duty and Power to Say So ................... 12

II.    The Court Has Jurisdiction to Hear and Decide this Case ..................... 14

    A.    Standing ............................................................... 15

    B.    Ripeness ............................................................... 17

    C.    Mootness .............................................................. 17

        1.    Voluntary Cessation................................................ 17

        2.    Capable of Repetition, Yet Evading Review ....................... 21

    D.    Eleventh Amendment ................................................. 21

III.    Plaintiffs Have Advanced Viable Constitutional Claims...................... 22

    A.    Right to Association .................................................. 22

    B.    Free Exercise of Religion ............................................. 25

    C.    Second Amendment and Article I, §6 ................................. 26

    D.    Fourteenth Amendment ............................................... 31

        1.  Due Process—Arbitrary, Irrational, and Vague.................... 31

i

2. Due Process—Right to Travel .........................................................................33

3. Due Process—Right to Property ....................................................................35

4. Equal Protection ...............................................................................................36

CERTIFICATE OF COMPLIANCE WITH LOCAL RULES .....................................38

CERTIFICATE OF SERVICE ..................................................................................39

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page**

*281 Care Comm. v. Arneson*,
638 F.3d 621 (8th Cir. 2011) ..................................................................................22

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967)..............................................................................................17

*Adarand Constructors, Inc. v. Slater*,
528 U.S. 216 (2000)..............................................................................................18

*Aetna Life Ins. Co. v. Haworth*,
300 U.S. 227 (1937)..............................................................................................15

*Allen v. Wright*,
468 U.S. 737 (1984)..............................................................................................16

*Am. Freedom Law Ctr., Inc. v. Nessel*,
No. 1:19-cv-153, 2020 U.S. Dist. LEXIS 60622, (W.D. Mich. Jan. 15, 2020)............11

*Anderson v. City of LaVergne*,
371 F.3d 879 (6th Cir. 2004) ................................................................................23

*Andrews v. State*,
50 Tenn. 165 (1871)..............................................................................................26

*Arcara v. Cloud Books, Inc.*,
478 U.S. 697 (1986)..............................................................................................30

*Arill v. Maiz*,
992 F. Supp. 112 (D.P.R. 1998)............................................................................35

*Ass'n of Cleveland Fire Fighters v. City of Cleveland*,
502 F.3d 545 (6th Cir. 2007) ................................................................................31

*Bd. of Airport Comm'rs v. Jews for Jesus*,
482 U.S. 569 (1987)..............................................................................................24

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................12

*Bench Billboard Co. v. City of Cincinnati*,
675 F.3d 974 (6th Cir. 2012) ................................................................................36

*Bible Believers v. Wayne Cnty.*,
805 F.3d 228 (6th Cir. 2015) .............................................................................25, 36

*Cady v. Arenac Cty.*,
574 F.3d 334 (6th Cir. 2009) ...........................................................................21

*Cantwell v. Conn.*,
310 U.S. 296 (1940)...........................................................................................13

*Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*,
648 F.3d 365 (6th Cir. 2011) ...........................................................................12

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993).........................................................24, 25, 26, 29, 30, 34

*City of Mesquite v. Aladdin's Castle, Inc.*,
455 U.S. 283 (1982)...........................................................................................18

*Cole v. City of Memphis*,
839 F.3d 530 (6th Cir. 2016) ...........................................................................33

*Compagnie Francaise de Navigation a Vapeur v. La. State Bd. of Health*,
186 U.S. 380 (1902)...........................................................................................14

*Connection Distributing Co. v. Reno*,
154 F.3d 281 (6th Cir. 1998) ...........................................................................23

*D.C. v. Heller*,
554 U.S. 570 (2008)......................................................................................26, 28

*Ex Parte Young*,
209 U.S. 123 (1908) ...........................................................................................21

*Ezell v. Chi.*,
651 F. 3d 684 (7th Cir. 2011) .....................................................................26, 27, 29

*Frisby v. Schultz.*
487 U.S. 474 (1988)...........................................................................................23

*GeorgiaCarry.Org, Inc. v. Ga.*,
687 F.3d 1244 (11th Cir. 2012) .......................................................................28

*Healy v. James*,
408 U.S. 169 (1972) ...........................................................................................22

*House of Representatives & Senate v. Governor*,
No. 161377, 2020 Mich. LEXIS 1032, (June 4, 2020) ............................................................20

*Jackson v. City & Cnty. S.F.*,
746 F. 3d 953 (9th Cir. 2014) ...........................................................................................26

*Jacobson v. Commonwealth of Mass.*,
197 U.S. 11 (1905) .................................................................................................. *passim*

*Johnson v. City of Cincinnati*,
310 F.3d 484 (6th Cir. 2002) ..................................................................................20, 33, 34

*Jones v. City of Cincinnati*,
521 F.3d 555 (6th Cir. 2008) ............................................................................................12

*Kachalsky v. Cnty. of Westchester*,
701 F.3d 81 (2d Cir. 2012) ...............................................................................................28

*Kerr v. Comm'r of Soc. Sec.*,
874 F.3d 926 (6th Cir. 2017) ............................................................................................21

*Logan v. Zimmerman Brush Co.*,
455 U.S. 422 (1982) .......................................................................................................35

*Mangual v. Rotger-Sabat*,
317 F.3d 45 (1st Cir. 2003) ..............................................................................................22

*McCullen v. Coakley*,
573 U.S. 464 (2014) .......................................................................................................35

*McDonald v. City of Chi.*,
561 U.S. 742 (2010) ...................................................................................................26, 28

*Med Corp., Inc. v. City of Lima*,
296 F.3d 404 (6th Cir. 2002) ............................................................................................35

*Meeks v. Larsen*,
611 F. App'x 277 (6th Cir. 2015) .......................................................................................26

*Meyer v. Neb.*,
262 U.S. 390 (1923) .......................................................................................................31

*Mills v. Barnard*,
869 F.3d 473 (6th Cir. 2017) ............................................................................................12

*NAACP v. Ala.,*
357 U.S. 449 (1958) .................................................................................................23

*Nat'l Rifle Assoc. of Am. v. Magaw,*
132 F.3d 272 (6th Cir. 1997) .............................................................................16, 17

*Ohio Nat'l Life Ins. Co. v. United States,*
922 F.2d 320 (6th Cir. 1990) ...................................................................................11

*People v. Deroche,*
829 N.W.2d 891 (Mich. Ct. App. 2013) ..................................................................26

*Phillips v. City of New York,*
775 F.3d 538 (2d Cir. 2015)......................................................................................13

*Planned Parenthood v. Casey,*
505 U.S. 833 (1992)....................................................................................................2

*Prince v. Massachusetts,*
321 U.S. 158 (1944) ..................................................................................................33

*Roberts v. Neace,*
No. 2:20cv054 (WOB-CJS), 2020 U.S. Dist. LEXIS 77987, (E.D. Ky. May 4, 2020) ...........1, 33

*Roberts v. Neace,*
No. 20-5465, 2020 U.S. App. LEXIS 14933, (6th Cir. May 9, 2020)........................1, 12, 14, 33

*Roberts v. U.S. Jaycees,*
468 U.S. 609 (1984).................................................................................................23

*Rosales-Garcia v. Holland,*
322 F.3d 386 (6th Cir. 2003) ...................................................................................21

*Saieg v. City of Dearborn,*
641 F.3d 727 (6th Cir. 2011) ..............................................................................34, 35

*Seal v. Morgan,*
229 F.3d 567 (6th Cir. 2000) ...................................................................................29

*Speech First, Inc. v. Schlissel,*
939 F.3d 756 (6th Cir. 2019) ........................................................................18, 19, 20

*Steffel v. Thompson,*
415 U.S. 452 (1974) ..................................................................................................16

*Sterling v. Constantin*,
287 U.S. 378 (1932) ........................................................................................2

*Stimmel v. Sessions*,
879 F.3d 198 (6th Cir. 2018) ....................................................27, 28, 29

*Susan B. Anthony List v. Driehaus*,
134 S. Ct. 2334 (2014) ..................................................................................15

*Thomas v. Union Carbide Agric. Prod. Co.*,
473 U.S. 568 (1985) ......................................................................................17

*Toth v. Grand Trunk R.R.*,
306 F.3d 335 (6th Cir. 2002) ........................................................................9

*Tyler v. Hillsdale Cty. Sheriff's Dep't*,
837 F.3d 678 (6th Cir. 2016) ..............................................................27, 28

*United States v. Greeno*,
679 F.3d 510 (6th Cir. 2012) ......................................................................27

*United States v. Masciandaro*,
638 F.3d 458 (4th Cir. 2011) ......................................................................28

*United State v. Miller*,
307 U.S. 174 (1939) ......................................................................................26

*United States v. W. T. Grant Co.*,
345 U.S. 629 (1953) ......................................................................................18

*United States ex rel. Dingle v. BioPort Corp.*,
270 F. Supp. 2d 968 (W.D. Mich. 2003) ......................................................9

*Warth v. Seldin*,
422 U.S. 490 (1975) ......................................................................................16

## **Constitutions**

Mich. Const. art. I § 6 ..................................................................................26

U.S. Const. amend. II ..................................................................................26

U.S. Const. art. III ........................................................................................14

## Rules

Fed. R. Civ. P. 12(b) ...................................................................................................11, 12

Fed. R. Evid. 201 .............................................................................................................9

## Statutes

MCLS § 10.31 ..................................................................................................................20

MCLS § 205.54p(2)(a) .....................................................................................................25

MCLS § 205.94m(2)(a) ....................................................................................................25

MCLS § 211.7s .................................................................................................................25

Superior Twp. Zoning Ordinance Article 17 § 32 ...........................................................25

## Other

https://nymag.com/intelligencer/2020/03/cdcs-worst-case-coronavirus-model-210m-infected-1-
7m-dead.html ....................................................................................................................11

https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html...........................11

https://www.detroitnews.com/story/news/local/michigan/2020/05/05/university-michigan-
health-system-lays-off-1400-health-care-workers/3084104001/................................................9, 10

https://www.foxnews.com/politics/barr-doj-may-side-with-citizens-who-sue-states-over-
coronavirus-restrictions ........................................................................................................1

## INTRODUCTION

The frightening breadth of power that the Governor seeks to wield against the private citizens of Michigan during this current pandemic is on full display in Defendants' motions to dismiss.  As U.S. Attorney General Barr observed, "Our federal constitutional rights don't go away in an emergency.  They constrain what the government can do."[1]  *See also Roberts v. Neace*, No. 2:20cv054 (WOB-CJS), 2020 U.S. Dist. LEXIS 77987, at *14 (E.D. Ky. May 4, 2020) ("The Court is aware that the pandemic now pervading the nation must be dealt with, but without violating the public's constitutional rights.").  The Governor feels only a nominal constraint by our Constitution, as evidenced by her actions here and underscored by her current motion.  The Governor and her loyal prosecutors, including Defendant Mackie, believe that under the banner of public health the Governor's power is plenary and that this Court has little role, if any, in curtailing that power.  They are mistaken.

There is no pandemic exception to the fundamental liberties guaranteed by the Constitution.  And *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), does not provide one.  The Sixth Circuit recently affirmed this point.  *See Roberts v. Neace*, No. 20-5465, 2020 U.S. App. LEXIS 14933, (6th Cir. May 9, 2020) (granting injunction to enjoin the Kentucky governor's restriction on the free exercise of religion during the current pandemic).  Indeed, *Jacobson* affirms the crucially important role of the judiciary (this Court) to ensure that such an exception *never* exits.  Per the Supreme Court: "[I]f a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, *it is the duty of the courts to so adjudge*, *and thereby give effect*

---

[1]  (*See*  https://www.foxnews.com/politics/barr-doj-may-side-with-citizens-who-sue-states-over-coronavirus-restrictions).

*to the Constitution.*"  *Jacobson*, 197 U.S. at 31 (emphasis added).  If this Court were to accept Defendants' position, then it is the fiat of the Governor, and not the Constitution, that is the supreme law of the land.  *Cf. Sterling v. Constantin*, 287 U.S. 378, 397–98 (1932) ("If this extreme position could be deemed to be well taken, it is manifest that the fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land; that the restrictions of the Federal Constitution upon the exercise of state power would be but impotent phrases[.]"); *see also Planned Parenthood v. Casey*, 505 U.S. 833, 857 (1992) (citing *Jacobson* for the proposition that "a State's interest in the protection of life falls short of justifying any plenary override of individual liberty claims").  Here, Defendants seek a "plenary override of individual liberty claims" through the enforcement of executive orders.  The Court should forbid it and deny Defendants' motions.

## STATEMENT OF FACTS

On March 23, 2020, Defendant Whitmer issued EO 2020-21, which was described as a "[t]emporary requirement to suspend activities that are not necessary to sustain or protect life." (First Amended Compl. ¶ 21 ["FAC"]).  On April 9, 2020, Defendant Whitmer issued EO 2020-42, which "reaffirm[ed] the measures set forth in Executive 2020-21, clarif[ied] them, and extend[ed] their duration to April 30, 2020."  The executive order took effect "on April 9, 2020 at 11:59 pm."  When EO 2020-42 took effect, it rescinded EO 2020-21.  (FAC ¶ 22).

By its own terms, EO 2020-42 was to remain in effect until April 30, 2020 at 11:59 pm. Defendant Whitmer publicly expressed a desire to extend the measures of EO 2020-42 into June 2020.  Though EO 2020-42 was rescinded when EO 2020-59 took effect, Defendant Whitmer retains the power and inclination to institute the measures in EO 2020-42 at any time she sees fit.

A "willful violation" of Defendant Whitmer's executive orders is a misdemeanor.  (FAC ¶¶ 23,

24).

EO 2020-42 put in place draconian measures that arbitrarily and unreasonably imposed

restrictions and thus criminal sanctions on Plaintiffs' fundamental rights and liberty.  (FAC ¶

25).  The order stated, in relevant part, the following:

> 2.  Subject to the exceptions in section 7, _all_ individuals currently living within the State of Michigan are _ordered to stay at home or at their place of residence_. Subject to the same exceptions, _all public and private gatherings of any number of people occurring among persons not part of a single household are prohibited._
> * * *
> 7.  Exceptions.
> a.   Individuals may leave their home or place of residence, and travel as necessary:
> 1.  To engage in outdoor physical activity, consistent with remaining at least six feet from people from outside the individual's household.  Outdoor physical activity includes walking, hiking, running, cycling, kayaking, canoeing, or other similar physical activity, as well as any comparable activity for those with limited mobility.
> * * *
> 6.   To obtain necessary services or supplies for themselves, their family or household members, _their pets_, and their vehicles.
> * * *
> 7.  To care for a family member or a family member's pet in another household.
> * * *
> b.   Individuals may leave their home or place of residence, and travel as necessary:
> 1.  To return to a home or place of residence from outside the state.
> 2.  To leave this state for a home or residence elsewhere.
> 3.  Between two residences in this state, through April 10, 2020.  _After that date, travel between two residences is not permitted._
> * * *
> c.  _All other travel is prohibited_, including all travel to vacation rentals.

(FAC ¶ 26, Ex. 1) (emphasis added).

Plaintiff Beemer and members of her household frequently travel to her cottage, property

which she owns, located in Charlevoix County.  She would often leave from her residence in

Saginaw, Michigan and travel to the cottage on a Thursday, remaining at her cottage over the

weekend and returning late on Sunday or early Monday morning.  Her cottage is a second home, and it is her private retreat from the daily grind of her law practice.  (FAC ¶ 27).

Under the measures set forth in EO 2020-42, if Plaintiff Beemer travelled to her cottage, she would have committed a criminal offense, subjecting her to prosecution for violating the executive order.  As a result, Plaintiff Beemer ceased her travel and was thus denied the use and enjoyment of her private property by the government while this order was in effect.  Plaintiff Beemer had no recourse for this deprivation of her property rights other than seeking redress in a court of law by bringing this action.  (FAC ¶ 28).

There is little to no chance that Plaintiff Beemer would have caused the spread of COVID-19 by travelling with members of her household from her residence in Saginaw, Michigan to her cottage in Charlevoix County.  In fact, she and members of her household are more isolated at the cottage than when they are at their home in Saginaw.  (FAC ¶ 29).

EO 2020-42 permitted individuals to travel from Saginaw to Charlevoix County to purchase pet food, gasoline, marijuana, Lotto tickets, and liquor, among other reasons.  Under EO 2020-42, a Wisconsin or Ohio resident could have travelled from his State to his cottage in Charlevoix County, Michigan without violating the order.  Thus, the order discriminated against individuals, including Plaintiff Beemer, based upon their State of residence, it impaired their right to travel, and it deprived them of the use and enjoyment of their property.  Prohibiting individuals from traveling from one place of residence in the State to another place of residence or cottage within the State had no real or substantial relation to promoting the objectives of EO 2020-42, particularly in light of the exceptions permitted by the order.  (FAC ¶¶ 30-32).

Following the issuance of EO 2020-21, and reaffirmed in EO 2020-42 and EO 2020-59, Defendant Whitmer has refused to close abortion centers in Michigan even though abortion is an

- 4 -

elective procedure and is contrary to the stated goal of the executive orders "to sustain or protect life."  Moreover, it is impossible to practice social distancing in an abortion center due to the nature of the procedure.  Defendant Whitmer also permitted marijuana businesses to remain open during this pandemic, and she allowed these businesses "to sell or transfer marijuana" to a purchaser "who has an expired driver license or government-issued identification card during home delivery and curbside sales."  (FAC ¶¶ 33, 34).

In contrast, there is little to no chance that a landscaping business, for example, will spread COVID-19.  Yet, EO 2020-42 closed these businesses.  Landscaping businesses could easily practice social distancing and other safety measures recommended by the CDC.  There is far less likelihood of a landscaping business spreading COVID-19 than other businesses that Defendant Whitmer permitted to remain open under her executive orders, specifically including hardware stores, convenience stores, grocery stores, gas stations, marijuana businesses, and abortion centers.  (FAC ¶ 35).

During her free time, Plaintiff Beemer enjoys boating on Lake Charlevoix.  However, EO 2020-42 prohibited this activity.  Under this executive order, Defendant Whitmer permitted kayaking and canoeing, but arbitrarily prohibited the use of boats with motors.  (FAC ¶ 36).

Plaintiff Muise is professionally trained in the use of firearms, he legally owns firearms, and he is a staunch defender of the Second Amendment, which constitutionally guarantees him the right to bear arms for self-defense, defense of his family, and for the defense of a free State.  He also uses firearms to hunt in Michigan and in other States.  To support his right to bear arms, which necessarily includes the right to purchase firearms and ammunition, Plaintiff Muise patronizes local gun shops, specifically including a gun shop located in Washtenaw County.  (FAC ¶¶ 38, 39).

- 5 -

EO 2020-42 ordered all non-essential businesses and activities to cease.  Though this order exempted "critical infrastructure," Defendant Whitmer purposefully referenced an outdated list of such industries (issued March 19, 2020) rather than the more current federal guidelines (issued March 28, 2020) that designated firearm and ammunition retailers as critical.  This deliberate action shut down gun stores[2] in order to deny citizens, including Plaintiff Muise, access to their Second Amendment rights.  Thus, for reasons that can only be explained as political, Defendant Whitmer considered Lotto, marijuana, liquor, and abortion to be essential but not firearms and ammunition.  Consequently, the order also banned travel to gun stores but permitted individuals to travel to buy pet food, marijuana, liquor, and Lotto tickets, among other items.  (FAC ¶¶ 40-42).

Accordingly, EO 2020-42 prohibited Plaintiff Muise from traveling to gun stores to purchase firearms and ammunition and to travel to gun ranges to train with his firearms.  Because he did not want to be subject to criminal or other sanctions for violating the executive order, Plaintiff Muise did not travel to any guns stores or ranges while EO 2020-42 was in effect. (FAC ¶ 43).

Due to the panic caused by the pandemic and the uncertainty caused by Defendant Whitmer's executive orders, owning and possessing firearms is critically important at this time. EO 2020-42 deprived Michigan residents, including Plaintiff Muise, of their fundamental right to use arms in defense of their "hearth and home."  (FAC ¶ 44).

Plaintiff Muise and his wife have been blessed with twelve children and eleven grandchildren (with another grandchild expected by July).[3]   Three of his adult children are

---

[2] Defendant Whitmer concedes in her brief that gun stores were closed because she considered them "non-essential."  (Governor Br. at 35).
[3] (*See* Muise Decl. ¶ 5 at Ex. 1).

- 6 -

married and reside locally in homes they own in Michigan, and two of his adult children reside locally in rental properties in Michigan.  His other seven children reside at his home in Superior Township.  (FAC ¶ 45).

On most Sundays, Holy Days, and other special events, the family would gather at Plaintiff Muise's home for a meal, fellowship, and prayer.  The family's faith is the center of their family life.  (FAC ¶ 46).

Plaintiff Muise and his family are devout Catholics.  Because of COVID-19, there were no public Masses in the Lansing Diocese.  However, Jesus Christ taught that where two or more gather in His name, He is present.  (Matthew 18:20).  Plaintiff Muise wanted his family to gather together on Sundays, other Holy Days, and special events to associate for a meal, fellowship, and prayer, and thus gather as a family in Christ's name.  Such gatherings are religious worship for Plaintiff Muise.  However, under the measures expressly set forth in EO 2020-42, it was a crime in Michigan to engage in such family associations and gatherings.  EO 2020-42 stated that "a place of religious worship, when used for religious worship, is not subject to penalty."  But there were no definitions or guidance within the executive order to explain how this exemption applied.  EO 2020-59 stated that "neither a place of religious worship nor its owner is subject to penalty under section 20 of this order for allowing religious worship at such place."  But again, there were no definitions or guidance within the executive order to explain how this exemption applied.  (FAC ¶¶ 47-49).

In addition to criminal sanctions for violating an executive order, Plaintiffs also feared that they could jeopardize their Michigan law practices and related for-profit and non-profit business interests if they violated an executive order.  Defendant Whitmer was quoted in the news on or about April 1, 2020, as follows: "You know, just about every business in the state has

some sort of license, from the state of Michigan or not, and so we've encouraged them not to play fast and loose with this order because their licenses could be in jeopardy as a result."  (FAC ¶ 51).

Defendant Whitmer has expressly stated her willingness to "return to her old ways," stating that the State must "be nimble enough to go backward, on occasion."  Additionally, the CDC has predicted a second wave of COVID-19 next winter, coinciding with the annual flu season.  Some experts insist that lockdown restrictions similar to those challenged here should remain in effect until a vaccine is developed, and this could take up to 18 months. Moreover, each year there is a flu season.  Some years, such as this one, are far worse than others.  Consequently, restrictions like those challenged here will easily and predictably become the "new norm."  (FAC ¶¶ 57-60).

The public interest in determining the legality of the executive orders was on full display on April 15, 2020, when thousands of Michigan residents and other demonstrators descended upon the State Capitol in Lansing, Michigan in what was called "Operation Gridlock" to publicly protest Defendant Whitmer's restrictions on their liberty.  (FAC ¶ 61).

## LIFTING THE PANDEMIC VEIL

Defendants Whitmer and Nessel complain that "[t]he complaint offers a glaringly sparse discussion of the public health crisis that has consumed not just Michigan, but the entire planet." (Gov. Br. at 3 [Doc. No. 32]).  Their complaint is misguided.  To begin, it is the government's burden to justify its restriction on a fundamental liberty; it is not a private citizen's burden to justify his freedom.  The Bill of Rights is a brake on the power of government; it is not a conferring of rights by the government only to be withheld at the whim of a government official.

Throughout this pandemic, government officials (including Defendant Whitmer) keep moving the goal posts. They feel compelled to lord over nearly every detail of our lives, and they justify this power grab by relying on fear and a parade of horribles.[4]  For example, in their brief, Defendants Whitmer and Nessel assert, without supporting evidence or data, that "[a]s the virus ravaged southeastern Michigan, health systems were quickly at or above capacity. Medical supplies were dwindling, and beds in intensive care units were in short supply." (Gov. Br. at 22). The facts do not support this assertion.[5]  Based on (widely considered inflated) data from the Michigan Department of Health and Human Services, the CDC, and USAfacts.org (which the CDC has cited and relied upon for some of its data), during the month of April, the average weekly percentage of *available* ICU beds in Michigan ranged from 20.89% to 31.50%, and the average weekly percentage of *available* inpatient hospital beds in Michigan ranged from 36.17% to 39.54%. (Korkes Decl. ¶¶ 3-5, Ex. A, at Ex. 2). During the first two weeks in May, the average weekly percentage of *available* ICU beds in Michigan ranged from 31.80% to 33.93%, and the average weekly percentage of *available* inpatient hospital beds in Michigan ranged from 35.24% to 36.60%. (*Id.* ¶¶ 3-5, Ex. A, at Ex. 2). There *never* was a shortage of hospital capacity. And Defendant Whitmer's ban on "elective" medical procedures (except, of course, abortion) appears to be destroying Michigan's healthcare system.[6]  It is more likely than not that

---

[4] Defendant Mackie echoes this apocalyptic narrative. (Mackie Br. at 2 [Doc. No. 34]).

[5] Plaintiffs request that the Court take judicial notice of the adjudicative facts found in the documents attached to the declarations of Gabriella Korkes and Plaintiff Muise. Rule 201 of the Federal Rules of Evidence governs judicial notice of adjudicative facts. *Toth v. Grand Trunk R.R.*, 306 F.3d 335, 349 (6th Cir. 2002); Fed. R. Evid. 201. Pursuant to Rule 201, "[p]ublic records and government documents are generally considered 'not to be subject to reasonable dispute.' This includes public records and government documents available from reliable sources on the Internet." *United States ex rel. Dingle v. BioPort Corp.*, 270 F. Supp. 2d 968, 972 (W.D. Mich. 2003) (internal citation omitted) (citing cases). A court must take judicial notice "if requested by a party and supplied with the necessary information." Fed. R. Evid. 201(d).

[6] (*See* https://www.detroitnews.com/story/news/local/michigan/2020/05/05/university-michigan-

the collateral damage caused by Defendant Whitmer's draconian restrictions is going to be *far* worse than the virus itself.

According to the "Official Website of Michigan.Gov," as of May 27, 2020, there were reportedly 55,608 confirmed COVID-19 cases and 5,334 deaths statewide.  The City of Detroit and Wayne County accounted for 19,999 of the cases and 2,406 of the deaths.  In comparison, Saginaw County, where Plaintiff Beemer resides, reported only 1,002 cases and 107 deaths, and Washtenaw County, where Plaintiff Muise resides, reported only 1,305 cases and 97 deaths. Charlevoix County, where Plaintiff Beemer's cottage is located, reported only 15 cases and 1 death.  In fact, according to Michigan's statistics as of May 27, fifty-seven (57) out of the eighty (80) counties reporting had ten (10) *or less* deaths associated with COVID-19.[7]  Indeed, the State's pandemic is largely confined to the City of Detroit (10,872 cases), surrounding Wayne County (9,127 cases), and the suburbs of Oakland (8,260 cases) and Macomb (6,558 cases) counties, accounting for 34,817 reported cases as of May 27, 2020.  And the same jurisdictions reported 4,151 deaths during this time from COVID-19, which was nearly 78% percent of the statewide total of 5,334 deaths.  The rest of Michigan has been relatively unaffected.  Yet, Defendant Whitmer's statewide restrictions took *no* account of regional differences.

Additionally, when you evaluate the data based on age, 87% of the deaths occurred in people 60 or older (69% of which were 70 or older).  The median age of death is 77 years.[8]  Yet, Defendant Whitmer's restrictions took *no* account of this difference.

Moreover, during the *peak period* of this pandemic (March through May), *far more* people died in Michigan from cancer and heart disease (7,329) than from the virus (4,349).[9]

---

health-system-lays-off-1400-health-care-workers/3084104001/ [last visited May 27, 2020]).
[7] (Muise Decl. ¶ 2, Ex. A at Ex. 1).
[8] (Muise Decl. ¶ 2, Ex. A at Ex. 1).

As this Court is no doubt aware, the projections upon which government leaders made their decisions back in March were grossly inaccurate. One model from the CDC projected between 160 to 214 million infections and between 200,000 to 1.7 million deaths nationwide.[10] The actual numbers are but a *fraction* of those projections.[11] Yet, this same fear mongering persists today, and it is being used to justify unprecedented and overly broad (not to mention, unconstitutional) restrictions on personal liberty. In short, the facts do not support this frontal assault on freedom.

## STANDARD OF REVIEW

### A.    Rule 12(b)(1).

A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction may take the form of a facial challenge, which tests the sufficiency of the pleading, or a factual challenge, which contests the factual basis for jurisdiction. *See Am. Freedom Law Ctr., Inc. v. Nessel*, No. 1:19-cv-153, 2020 U.S. Dist. LEXIS 60622, at *9 (W.D. Mich. Jan. 15, 2020); *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). In a facial attack, the court accepts as true all the allegations in the complaint. *Id*. at 325. In a factual attack, the allegations are not afforded a presumption of truthfulness and the court weighs competing evidence to determine whether subject matter jurisdiction exists. *Id.* Defendants do not identify whether this is a facial or a factual attack. However, it appears to be a facial challenge.

---

[9] (Muise Decl. ¶ 3, Ex. B at Ex. 1).
[10] (*See* Chas Danner, *CDC's Worst-Case Coronavirus Model: 214 Million Infected, 1.7 Million Dead*, N.Y. Magazine Intelligencer, updated Mar. 13, 2020, available at https://nymag.com/intelligencer/2020/03/cdcs-worst-case-coronavirus-model-210m-infected-1-7m-dead.html).
[11] (*See* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html [reporting 1,662,414 cases and 98,261 deaths in the entire United States]) (last updated May 26, 2020; last visited May 27, 2020)).

**B.** **Rule 12(b)(6).**

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege facts sufficient to state a claim for relief that is "plausible on its face" and, when accepted as true, are sufficient to "raise a right to relief above the speculative level." *Mills v. Barnard*, 869 F.3d 473, 479 (6th Cir. 2017) (citation omitted). "A claim is plausible on its face if the 'plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Ctr. for Bio- Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 556 (2007)). When reviewing Defendants' motions under Rule 12(b)(6), the Court must construe the First Amended Complaint in the light most favorable to Plaintiffs, accept its factual allegations as true, and draw all reasonable inferences in Plaintiffs' favor. *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008).

## ARGUMENT

**I.** **The Pandemic Does Not Empower the Governor to Infringe Fundamental Rights nor Does It Deprive this Court of Its Duty and Power to Say So.**

Neither *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), nor this current pandemic prevents this Court from declaring the challenged measures unlawful and enjoining their enforcement—now and in the future. As recently stated by the Sixth Circuit, "While the law may take periodic naps during a pandemic, we will not let it sleep through one." *Roberts*, No. 20-5465, 2020 U.S. App. LEXIS 14933, at \*10 (granting a preliminary injunction under the First Amendment and enjoining the enforcement of Kentucky's ban on "mass gatherings" during the current pandemic as applied to in-person church attendances).

In *Jacobson*, amid a smallpox outbreak, a city (acting pursuant to a state statute) mandated the vaccination of all of its citizens. The Court upheld the statute against a Fourteenth

Amendment challenge, clarifying that the State's action was a lawful exercise of its police powers and noting that, "[u]pon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Id.* at 27. While the Court in *Jacobson* urges deferential review in times of emergency, it clearly demands that the courts enforce the Constitution. *See id.* at 28. Indeed, the Court explicitly contemplates an important and essential backstop role for the judiciary. *See id*. at 30 (acknowledging that during a public health crisis the courts have the "duty" to "give effect to the Constitution").

Under *Jacobson*, therefore, a State's emergency response can still be unlawful if it impinges on a fundamental right in a "plain, palpable" way or has "no real or substantial relation" to the public safety concerns at issue. *Id.* at 31. Accordingly, per *Jacobson*, requiring a vaccination for a disease that is the *source* of the public emergency is directly related to the government's public safety concerns. The same is not true of the challenged measures at issue here.

Moreover, nothing in *Jacobson* supports the view that an emergency *displaces* normal constitutional standards. Rather, *Jacobson* provides that an emergency may justify temporary constraints *within* those standards. As the Second Circuit observed, *Jacobson* merely rejected what would now be called a "substantive due process" challenge to a compulsory vaccination requirement, holding that such a mandate "was within the State's police power." *Phillips v. City of New York*, 775 F.3d 538, 542-43 (2d Cir. 2015) (observing that "*Jacobson* did not address the free exercise of religion because, at the time it was decided, the Free Exercise Clause of the First Amendment had not yet been held to bind the states") (citing *Cantwell v. Conn.*, 310 U.S. 296, 303 (1940)). *Jacobson* does not give license to government officials to broadly suspend the

Constitution during a public health crisis. The Sixth Circuit affirms this point. *See Roberts*, No. 20-5465, 2020 U.S. App. LEXIS 14933, at *6-14 (acknowledging *Jacobson*, applying a traditional free exercise analysis in a challenge to the Kentucky governor's executive order issued during the pandemic, and enjoining the challenged provision).

And contrary to Defendants' argument, the overly broad and irrational restrictions at issue here are not remotely comparable to the restriction imposed upon healthy individuals who were quarantined aboard a ship on which others had cases of a serious disease. (*See* Gov. Br. at 14 [stating that "*Jacobson* even highlighted the circumstance, without hesitation, in which seemingly healthy people were quarantined against their will aboard a ship on which others had cases of serious diseases," citing *Jacobson*, 197 U.S. at 29, and citing *Compagnie Francaise de Navigation a Vapeur v. La. State Bd. of Health*, 186 U.S. 380, 393 (1902) (upholding Louisiana's right to quarantine even apparently healthy passengers aboard a vessel over a due process challenge)]). Defendant Whitmer did not narrowly limit her quarantine restrictions based on the threat (*i.e.*, focusing her restrictions on places like Detroit, where the virus was most prevalent, or on the most vulnerable, such as the elderly). Instead, she imposed overly broad and universal restrictions that were *not* tied to the facts. Also, the vessel quarantines would be more comparable to the current situation if the quarantine restriction also had exceptions that permitted people to leave the ship to purchase liquor, alcohol, a Lotto ticket, pet food, or to procure an abortion. *Jacobson* does not justify or support the broad restrictions at issue here.

We turn now to the jurisdiction issues raised by Defendants.

## II.    The Court Has Jurisdiction to Hear and Decide this Case.

Article III of the Constitution confines the federal courts to adjudicating actual "cases" or "controversies." U.S. Const. art. III, § 2. As stated by the Supreme Court:

> A justiciable controversy is . . . distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937) (citations omitted).

Here, there is nothing hypothetical, abstract, academic, or moot about the legal claims advanced. This case presents a real and substantial controversy between parties with adverse legal interests, and this controversy can be resolved through a decree of a conclusive character. *Id.* It will not require the Court to render an opinion advising what the law would be upon a hypothetical state of facts. *Id.*

In short, this Court has the power to hear and decide this case. It can determine whether the challenged measures infringe Plaintiffs' fundamental rights. The Court could then declare the measures unconstitutional and enter an appropriate order enjoining their future enforcement. Thus, this case presents a justiciable controversy in which the judicial function may be appropriately exercised. *Id.*; *see also Jacobson*, 197 U.S. at 31 (stating that it is the "duty of the courts to so adjudge" the constitutionality of an emergency order that directly impinges fundamental rights).

### A.     Standing.

In an effort to give meaning to Article III's "case" or "controversy" requirement, the courts have developed several justiciability doctrines, including standing. *See Susan B. Anthony List v. Driehaus,* 134 S. Ct. 2334, 2341 (2014). "The doctrine of standing gives meaning to these constitutional limits by identifying those disputes which are appropriately resolved through the judicial process." *Id.* (internal quotations and citation omitted).

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Consequently, to invoke the jurisdiction of a federal court, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984).

Plaintiffs satisfy the standing requirement. As stated by the Supreme Court, "[I]t is not necessary that [Plaintiffs] first expose [themselves] to actual arrest or prosecution to be entitled to challenge [an order imposing criminal penalties] that [they] claim[] deters the exercise of [their] constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Indeed, "courts have routinely found sufficient adversity between the parties to create a justiciable controversy when suit is brought by the particular plaintiff subject to the regulatory burden imposed by a statute," as in this case. *See Nat'l Rifle Assoc. of Am. v. Magaw*, 132 F.3d 272, 282 (6th Cir. 1997). Here, a violation of the challenged measures—which *directly* apply to deter Plaintiffs' conduct—is a crime.[12] Defendant Nessel, the Michigan Attorney General, has made clear that she will use her office to enforce Defendant Whitmer's executive orders. (FAC ¶ 17). Defendant Mackie, the Washtenaw County Prosecuting Attorney, is the official responsible for prosecuting violations of the executive orders in the county where Plaintiff Muise resides. (FAC ¶¶ 11, 19). And Defendant Whitmer has warned businesses and individuals licensed by the State

---

[12] Defendants assert that Plaintiffs lack standing because their conduct has not been deterred by the challenged orders. Defendants are mistaken. (*See, e.g.,* FAC ¶ 43 ["Because he did not want to be subject to criminal or other sanctions for violating the executive order, Plaintiff Muise did not travel to any gun[] stores or ranges while EO 2020-42 was in effect."], ¶ 47 [asserting that "Plaintiff Muise would like his family to gather . . . for a meal, fellowship, and prayer, and thus gather as a family in Christ's name" but under the challenged executive orders, "it was a crime in Michigan" to do so], ¶ 51 ["In addition to criminal sanctions for violating an executive order, Plaintiffs also fear that they could jeopardize their Michigan law practices and related for-profit and non-profit business interests if they violated an executive order."]).

(Plaintiffs are both licensed by Michigan to practice law in this State, and they both operate their practices in this State) "not to play fast and loose with [her executive orders] because their licenses could be in jeopardy as a result."  (FAC ¶ 51).  Standing is easily met in this case.

**B.    Ripeness.**

The basic rationale of the ripeness doctrine "is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements."  *Thomas v. Union Carbide Agric. Prod. Co.*, 473 U.S. 568, 580 (1985) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)).  "The problem is best seen in a twofold aspect, requiring [the courts] to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Abbott Labs.*, 387 U.S. at 149.

Ripeness is not an issue.  There is nothing abstract or hypothetical about this case.  The challenged measures were adopted and implemented by Defendant Whitmer via executive order, and a violation of any one of the challenged measures is a misdemeanor.  Accordingly, the issues are fit for judicial review, and the record is adequate to support an informed decision.  *Nat'l Rifle Assoc. of Am.*, 132 F.3d at 290 ("In considering the fitness of an issue for judicial review, the court must ensure that a record adequate to support an informed decision exists when the case is heard.").  Regarding the hardship aspect, this is best addressed in the context of mootness, which we turn to next.

**C.    Mootness.**

**1.    Voluntary Cessation.**

When a party seeks to escape liability by claiming that it has voluntarily ceased the offending conduct, as Defendants assert here, "the *heavy burden* of persuading the court that the challenged conduct cannot reasonably be expected to start up again *lies with the party*" seeking

to avoid liability. *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (internal quotations and citation omitted) (italics in original) (emphasis added). As the Court noted, not only is a defendant "free to return to his old ways," *but also the public has an interest "in having the legality of the practices settled."* *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953) (emphasis added); *see also City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, n. 10 (1982).

Consequently, "[a]long with its power to hear the case, the court's power to grant injunctive relief survives discontinuance of the illegal conduct." *W. T. Grant Co.*, 345 U.S. at 633. Thus, a claim for injunctive relief may be improper only "if the defendant can demonstrate that 'there is no *reasonable expectation* that the wrong will be repeated.' The [defendant's] burden is a *heavy one*." *Id.* (emphasis added). The Supreme Court has also instructed the lower courts to be particularly vigilant in cases such as this, warning that "[i]t is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." *Id.* at 632, n. 5. As the Court concluded, denying a plaintiff prospective relief "would be justified only if it were *absolutely clear* that the litigant no longer had <u>any</u> need of the judicial protection that it sought." *Adarand Constructors, Inc.*, 528 U.S. at 224 (emphasis added).

The Sixth Circuit's ruling in *Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019), in which the court found that the plaintiff's challenge to a university's speech restriction was not moot, is controlling here. A lengthy citation is in order. Per the court:

> While all governmental action receives some solicitude, *not all action enjoys the same degree of solicitude*. Determining whether the ceased action "could not reasonably be expected to recur," . . . takes into account the totality of the

- 18 -

circumstances surrounding the voluntary cessation, including the manner in which the cessation was executed.

Where the government voluntarily ceases its actions by enacting new legislation or repealing the challenged legislation, that change will presumptively moot the case unless there are clear contraindications that the change is not genuine. . . .

On the other hand, where a change is merely regulatory, the degree of solicitude the voluntary cessation enjoys is based on whether the regulatory processes leading to the change *involved legislative-like procedures* or were *ad hoc, discretionary, and easily reversible actions*.

*If the discretion to effect the change lies with* one agency or individual*, or there are no formal processes required to effect the change, significantly more than the bare solicitude itself is necessary to show that the voluntary cessation moots the claim*. . . .

Here, the University notes that the new definitions were "approved by senior University officials, including the University's president." The University has not, however, pointed to any evidence suggesting that it would have to go through the same process or some other formal process to change the definitions again. Thus, the solicitude the University receives is the same as any *ad hoc* regulatory action would. *Which is to say that the solicitude does not relieve the University of much of its burden to show that the case is moot.* . . .

The timing of the University's change also raises suspicions that its cessation is not genuine.[13] The University removed the definitions after the complaint was filed. If anything, this increases the University's burden to prove that its change is genuine. . . .

Significantly, the University continues to defend its use of the challenged definitions. Although not dispositive, *the Supreme Court has found whether the government "vigorously defends the constitutionality of its . . . program" important to the mootness inquiry.* . . .

In sum, *the University has not put forth enough evidence to satisfy its burden to show that its voluntary cessation makes it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."* . . . Therefore, Speech First's claim challenging the definitions of bullying and harassing behavior is not moot.

---

[13] Here, Defendant Whitmer eased her restrictions just days before the Court was to hold a hearing on Plaintiffs' motion for a preliminary injunction. (*See* Stipulation [Doc. No. 24]; Hr'g Notice [Doc. No. 15]).

*Id.* at 767-70 (internal citations and quotations omitted) (emphasis added); *see also Johnson v. City of Cincinnati*, 310 F.3d 484, 490 (6th Cir. 2002) ("[W]e note that the City's assurance that it no longer enforces the Ordinance . . . does not render the present appeal moot.  '[A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'") (citations omitted).

Here, Defendant Whitmer claims to possess broad powers to issue executive orders, including those at issue here, without *any* legislative oversight or approval, relying expressly on the Emergency Powers of Governor Act, Mich. Comp. Laws Serv. § 10.31.  *See generally House of Representatives & Senate v. Governor*, No. 161377, 2020 Mich. LEXIS 1032, (June 4, 2020).  Defendant Nessel agrees with Defendant Whitmer as to the Governor's plenary authority.[14]  Defendant Whitmer has also expressed her willingness to "return to her old ways," stating that the State must "be nimble enough to go backward, on occasion."  (FAC ¶ 57). Moreover, the CDC has predicted a second wave of COVID-19 next winter, coinciding with the annual flu season.  (FAC ¶ 58).  Some experts insist that lockdown restrictions similar to those challenged here should remain in effect until a vaccine is developed, and this could take up to 18 months.  (FAC ¶ 59).  And each year there is a flu season.  Some years, such as this one, are far worse than others.  Consequently, restrictions like those challenged here will easily and predictably become the "new norm," resulting in the loss of liberty.  (FAC ¶ 60). In sum, Defendant Whitmer is free to return to her old ways, and the public has a very strong interest in having the legality of the practices settled, as evidenced by the protests (FAC ¶ 61).  This case is not moot.

---

[14] (Muise Decl. ¶ 3, Ex. C at Ex. 1).

2.      Capable of Repetition, Yet Evading Review.

Given the nature and short duration of the challenged orders, this case is not moot because the unlawful action is capable of repetition, yet evading review.  As stated by the Sixth Circuit:

> "[A] case will not be considered moot if it (sic) the challenged activity is capable of repetition, yet evading review." . . .  "For this exception to apply, 'a challenged action must satisfy two requirements.  First, it must be too short in duration to be fully litigated before it ceases.  Second, there must be a *reasonable* expectation that the *same parties* will be subjected to the same action again.'"

*Kerr v. Comm'r of Soc. Sec.*, 874 F.3d 926, 932 (6th Cir. 2017) (internal citations omitted); *see also Rosales-Garcia v. Holland*, 322 F.3d 386, 397 (6th Cir. 2003) (rejecting argument that the appeal was moot and stating, in part, that "[w]e also believe that the indefinite detention of Rosales by the INS is a case 'capable of repetition, yet evading review'").  Here, (1) the challenged orders are too short in duration to be fully litigated before they cease, and (2) there is a reasonable expectation that the same parties will be subjected to the same action again as Plaintiffs are residents of this State, the Governor claims to have unrestrained authority to issue such orders, and there is a reasonable expectation of a recurrence of this and other similar public health emergencies.  (*See supra*).

In sum, this challenge is not moot, and it is ripe for review.

D.      Eleventh Amendment.

Defendant Mackie asserts that he enjoys immunity from this lawsuit.  He is mistaken. Although State officials generally enjoy Eleventh Amendment immunity, they may be sued in federal court for prospective relief to halt the enforcement of a State law that violates the Constitution.  *See Ex parte Young*, 209 U.S. 123 (1908).  And when a county official acts pursuant to state policy, as in this case, he is acting as a state official.  *Cady v. Arenac Cty.*, 574 F.3d 334, 343 (6th Cir. 2009) (concluding that a county prosecuting attorney sued in his official

- 21 -

capacity is acting as a state agent when enforcing a state law).   Moreover, as stated by the Supreme Court, "In making an officer of the State a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional it is plain that such officer *must have some connection with the enforcement of the act*."   *Ex parte Young*, 209 U.S. at 157 (emphasis added).

As the County Prosecutor for Washtenaw County—the county in which Plaintiff Muise resides—Defendant Mackie plainly has "some connection with the enforcement of" Defendant Whitmer's executive orders, a violation of which is a State law misdemeanor.   As the County Prosecutor, Defendant Mackie is the government official who is principally responsible for the enforcement of the executive orders.   (FAC ¶ 19).   Accordingly, he is a property party in this case.  As stated by the Eighth Circuit:

> When a statute is challenged as unconstitutional, the proper defendants are the officials whose role it is to administer and enforce the statute.   *Mangual* [*v. Rotger-Sabat*, 317 F.3d 45, 57 (1st Cir. 2003)].   The county attorneys are the parties primarily responsible for enforcing the criminal portion of the statute; enjoining them would redress a discrete portion of plaintiffs' alleged injury in fact. . . .   Granting declaratory or injunctive relief against the defendants, would redress a discrete injury to plaintiffs.   Thus, we find plaintiffs have standing.

*281 Care Comm. v. Arneson*, 638 F.3d 621, 631 (8th Cir. 2011).   In short, Defendant Mackie does not enjoy Eleventh Amendment immunity from the prospective relief sought by Plaintiff Muise.   We turn now to the substantive claims.

III.   **Plaintiffs Have Advanced Viable Constitutional Claims.**

A.   **Right to Association.**

"Among the rights protected by the First Amendment is the right of individuals to associate to further their personal beliefs."   *Healy v. James*, 408 U.S. 169, 181 (1972) (citations omitted).   The Sixth Circuit echoed this fundamental understanding, stating, "Freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of freedom of

- 22 -

speech." *Connection Distributing Co. v. Reno*, 154 F.3d 281, 295 (6th Cir. 1998) (citing *NAACP v. Ala.*, 357 U.S. 449, 460 (1958)).  "[I]mplicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).

"The Constitution protects two distinct types of association: (1) freedom of expressive association, protected by the First Amendment, and (2) freedom of intimate association, a privacy interest derived from the Due Process Clause of the Fourteenth Amendment but also related to the First Amendment." *Anderson v. City of LaVergne*, 371 F.3d 879, 881 (6th Cir. 2004); *see id.* ("[T]he Supreme Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion.").

It cannot be gainsaid that the right of family members to associate and to further their religious beliefs is fundamental, and it is protected by the First *and* Fourteenth Amendments.[15] *See Roberts*, 468 U.S. at 619-20 ("Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life. . . .  As a general matter, only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty.").  And this association should be afforded its greatest protection in one's private home.  *See, e.g., Frisby v. Schultz*. 487 U.S. 474, 484 (1988) ("Our prior decisions have often remarked on the unique nature of the home . . . and have recognized

---

[15] Plaintiff Muise advances his claim under the First and Fourteenth Amendments.  (FAC ¶¶ 83-86).

that preserving the sanctity of the home . . . is surely an important value.") (internal quotations and citations omitted).

The government's total ban of this right under the challenged measures must satisfy strict scrutiny. *Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569, 575 (1987) ("We think it obvious that [an absolute ban on activity protected by the First Amendment] cannot be justified even [in] a nonpublic forum because no conceivable governmental interest would justify such an absolute prohibition of speech."); *Anderson*, 371 F.3d at 882 ("A direct and substantial interference with intimate associations is subject to strict scrutiny. . . .") (internal quotations and citation omitted).

Due to the numerous exceptions, the challenged restriction fails this highest level of scrutiny. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) ("It is established in our strict scrutiny jurisprudence that a law cannot be regarded as protecting an interest 'of the highest order' . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.") (hereinafter "*Lukumi*") (internal quotations and citation omitted). For example, the challenged measures expressly exempted "a place of religious worship, when used for religious worship," which was later modified to state that "neither a place of religious worship nor its owner is subject to penalty under section 20 of this order for allowing religious worship at such place," but the executive orders *never* expressly exempted a private home from being used by immediate family members (not of the same household, as in the case of Plaintiff Muise) to gather for fellowship and worship as a family. Per the order, "[s]ubject to [the *exceptions* in section 7], *all* public and private gatherings of *any number* of *people occurring among persons not part of a single household are prohibited*." (FAC ¶ 26). Accordingly, private home gatherings for fellowship and religious worship were prohibited. Yet,

individuals were permitted to associate to engage in sporting, recreational, and other activities such as shopping at a grocery store—activities that are *not* protected by the Constitution. (*See id*.). Also, no reasonable person (or law enforcement officer) reading the executive orders would conclude that a private residence was a place of religious worship and thus exempt from the criminal proscriptions of the order. Indeed, the law is otherwise.[16] This last point further highlights the vagueness problems with the challenged measures. (*See infra* sec. III.D.1.).

### B.      Free Exercise of Religion.

"The principle that government may not enact laws that suppress religious belief or practice is . . . well understood." *Lukumi*, 508 U.S. at 523. In *Bible Believers v. Wayne County*, 805 F.3d 228 (6th Cir. 2015), the *en banc* court stated:

> The right to free exercise of religion includes the right to engage in conduct that is motivated by the religious beliefs held by the individual asserting the claim. . . . The government cannot prohibit an individual from engaging in religious conduct that is protected by the First Amendment. . . .

*Id*. at 255-56. Here, Plaintiff Muise wanted his family to gather together to associate for a meal, fellowship, and prayer, and thus gather as a family in Christ's name. Such gatherings are religious worship for Plaintiff Muise. However, under the challenged restriction, it was a crime to do so. Our Constitution does not permit such a direct infringement of personal liberty secured by the First Amendment. *Id*. Additionally, in light of the numerous exceptions permitted, the

---

[16] Plaintiff is aware of no legal basis for concluding that a "place of religious worship" is a private residence *absent a specific definition stating as such*—which, of course, the challenged orders do not include. *See, e.g.,* MCLS § 205.94m(2)(a) ("Regularly organized church or house of religious worship" means a religious organization qualified under section 501(c)(3) of the internal revenue code of 1986); MCLS § 205.54p(2)(a) (same); MCLS § 211.7s ("Houses of public worship includes buildings or other facilities owned by a religious society and used predominantly for religious services or for teaching the religious truths and beliefs of the society."); *see also* Superior Twp. Zoning Ordinance Article 17 § 32 ("Church, Temple, Place of Worship or Religious Institution.  A type of institutional use or site used for the regular assembly of persons, for the conducting of religious services, and for related accessory uses . . .").

restriction fails strict scrutiny.  Per the order, individuals not residing in the same household could gather to engage in secular activities, such as recreational sports or shopping at grocery or hardware stores, but they could not gather together to pray in their homes.  The restriction is unlawful.  *See Lukumi*, 508 U.S. at 547.

### C.    Second Amendment and Article I, §6.

Both the United States and Michigan Constitutions grant individuals a right to keep and bear arms for self-defense and to ensure the security of a free State.  U.S. Const. amend. II; Mich. Const. art. I § 6.  The Second Amendment is fully applicable to the states through the Fourteenth Amendment.  *McDonald v. City of Chi.*, 561 U.S. 742, 791 (2010); *Meeks v. Larsen*, 611 F. App'x 277, 286 (6th Cir. 2015).

"At the core of the Second Amendment is the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  *People v. Deroche*, 829 N.W.2d 891, 894 (Mich. Ct. App. 2013) (internal quotations and citations omitted).  Moreover, the right to keep and bear arms "implies a corresponding right to obtain the bullets necessary to use them," *Jackson v. City & Cnty. S.F.,* 746 F. 3d 953, 967 (9th Cir. 2014) (internal quotation marks omitted), and "to acquire and maintain proficiency in their use," *Ezell v. Chi.*, 651 F. 3d 684, 704 (7th Cir. 2011).  *See also D.C. v. Heller*, 554 U.S. 570, 617-18 (2008) (citing T. Cooley, *General Principles of Constitutional Law* 271 (2d ed. 1891) (discussing the implicit right to train with weapons)); *United State v. Miller*, 307 U.S. 174, 180 (1939) (citing 1 H. Osgood, *The American Colonies in the 17th Century* 499 (1904) (discussing the implicit right to possess ammunition)); *Andrews v. State*, 50 Tenn. 165, 178 (1871) (discussing both rights).

In sum, without protection for these closely related rights (purchasing firearms and ammunition and training with firearms) the Second Amendment would be toothless.  *See Ezell*,

- 26 -

651 F.3d at 704 ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective.").

The Sixth Circuit has adopted a two-step inquiry to determine whether government action violates the Second Amendment. *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Stimmel v. Sessions*, 879 F.3d 198, 204 (6th Cir. 2018). First, the *burden is on the government* to establish "that the challenged statute regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment—1791 Bill of Rights ratification or 1868 Fourteenth Amendment ratification." *Stimmel*, 879 F.3d at 204. If the government can meet this burden, then "the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review." *Id*. However, "[i]f the government offers historical evidence that is inconclusive or suggests that the regulated activity is *not* categorically unprotected, [then the court] must inquire into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Id.* (internal alterations omitted). In this second step, the court must "determine and apply the appropriate level of heightened means-end scrutiny, given that the Supreme Court has rejected rational-basis review in this context." *Id*.

To determine whether to apply intermediate or strict scrutiny, the court must look at "(1) how close the law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on the right." *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 690 (6th Cir. 2016) (internal quotation marks omitted).

Under the first prong, and as demonstrated above, Executive Order 2020-42 regulates activity (the purchase of firearms and ammunition and training with them) that *categorically* falls

within the scope of the Second Amendment.  In fact, it regulates activity that goes to the "core" right of the Second Amendment—it prohibits law-abiding citizens from purchasing firearms and ammunition for the protection of their "hearth and home."  (*See supra*); *see also Heller*, 554 U.S. at 634, 635; *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012) ("What we know from [*Heller* and *McDonald*] is that Second Amendment guarantees are at their zenith within the home."); *GeorgiaCarry.Org, Inc. v. Ga.*, 687 F.3d 1244, 1259 (11th Cir. 2012) ("The [Supreme] Court [in *Heller*] went to great lengths to emphasize the special place that the home—an individual's private property—occupies in our society.").  At stake here is a "basic right," *McDonald*, 561 U.S. at 767, "that the Framers and ratifiers of the Fourteenth Amendment counted . . . among those fundamental rights necessary to our system of ordered liberty," *id.* at 778.

Accordingly, turning to the second prong, "any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny."  *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011).  Incidental burdens on the right, however, are subject to intermediate scrutiny.  *See Stimmel*, 879 F.3d at 206-07 ("We hold that intermediate scrutiny is warranted for our review of [a statute prohibiting domestic violence offenders from having guns]" because the statute "places a substantial burden on the right, but does not touch the Second Amendment's core."); *Tyler*, 837 F.3d at 691 (applying intermediate scrutiny to a Second Amendment challenge by a person who was involuntarily committed).

Because the closing of gun stores (and restricting travel to gun stores) substantially and directly burdens the core right of self-defense, the restriction must satisfy strict scrutiny.  That is, the restriction must be narrowly tailored to serve a compelling government interest.  *See*

*generally Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir. 2000) ("Government actions that burden the exercise of those fundamental rights or liberty interests are subject to strict scrutiny, and will be upheld only when they are narrowly tailored to a compelling governmental interest."). Defendants cannot satisfy this highest level of scrutiny under the law, particularly in light of the exceptions permitted under the challenged executive orders, as noted in the text above and discussed further below. *See Lukumi*, 508 U.S. at 547. Indeed, the restriction is not narrowly tailored, as the below discussion under intermediate scrutiny further illustrates.

"Under intermediate scrutiny, the government must state a significant, substantial, or important objective and establish a reasonable fit between the challenged restriction and that objective." *Stimmel*, 879 F.3d at 207 (internal quotation marks omitted). The challenged restriction fails this level of scrutiny as well. While curbing the spread of a virus may well qualify as "a significant, substantial, or important objective" of the government that alone does not end the inquiry. The government also has the burden of establishing a "reasonable fit" between the challenged restriction and its objective. *Id.* It is this latter burden that the government fails to satisfy. *See, e.g., Ezell*, 651 F.3d at 709 (holding that a ban on gun ranges within a city violated the Second Amendment because "the City produced no empirical evidence whatsoever and rested its entire defense of the range ban on speculation about accidents and theft").

Here, the challenged restriction deemed pet stores, grocery stores, convenience stores, liquor stores, and stores that sell marijuana, among others, as "essential," but gun stores were "non-essential" and thus closed. The restriction permitted individuals to travel to pet stores to purchase cat litter, to travel to a convenience store to purchase Lotto tickets, to travel to a grocery store to purchase ice cream, to travel to stores to purchase marijuana, among other

exceptions, but Plaintiff Muise and other law-abiding Michigan residents were prohibited from traveling to gun stores/gun ranges to purchase firearms and ammunition and to train with them. This is, "beyond all question, a plain, palpable invasion of rights secured by the" Second Amendment.[17]

Finally, Defendants argue that the order closing gun stores and ranges as "non-essential" (but permitting, for example, pet stores to remain open) was a lawful, neutral law of general applicability. (*See* Gov. Br. at 36-37). Defendants are mistaken. In *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993), for example, the Court struck down on free exercise grounds an ordinance prohibiting the sacrifice of animals that defined sacrifice as the "unnecessary" killing of an animal. *See id.* The law permitted some animal killings as "necessary," but deemed the ritual, religious killing of an animal as unnecessary and thus criminal. *Id.* Because the ordinance permitted as "necessary" conduct that did not implicate a fundamental right (such as purchasing goldfish food at a pet store in this case) but prohibited as "unnecessary" conduct that did implicate a fundamental right (such as purchasing ammunition or a firearm at a gun store), the law was not a neutral law of general applicability. The Court struck it down. Here, the restriction on Plaintiff Muise's rights secured by the Second Amendment should receive the same fate as the ordinance at issue in *Lukumi*.

---

[17] Defendants' reliance on *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986), is misplaced. *Arcara* has nothing to do with guns or the Second Amendment. In this case, an adult bookstore was also operating as a place of prostitution. A series of New York statutes allowed places of prostitution to be closed as a public health nuisance. The owners of the bookstore argued that closure of their business would violate their First Amendment rights because, in addition to prostitutes, they sold books. The Supreme Court rejected the argument because the bookstore owners sought "to use the First Amendment as a cloak for obviously unlawful public sexual conduct by the diaphanous device of attributing protected expressive attributes to that conduct." *Arcara*, 478 U.S. at 705.

### D.        Fourteenth Amendment.

In *Meyer v. Nebraska*, 262 U.S. 390 (1923), the Court addressed the question of "whether the statute as construed and applied unreasonably infringes the liberty guaranteed to the plaintiff in error by the Fourteenth Amendment." *Id*. at 399.  As stated by the Court:

> The established doctrine is that this liberty may not be interfered with, under the guise of protecting the public interest, by legislative action which is *arbitrary* or without reasonable relation to some purpose within the competency of the State to effect.  Determination by the legislature of what constitutes proper exercise of police power is not final or conclusive but is *subject to supervision by the courts*.

*Id.* at 399-400 (emphasis added).

### 1.        Due Process—Arbitrary, Irrational, and Vague.

As stated by the Sixth Circuit:

> We have recognized that the vagueness doctrine has two primary goals: (1) to ensure fair notice to the citizenry and (2) to provide standards for enforcement by police, judges, and juries. . . .  With respect to the first goal, the Supreme Court has stated that "[a] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." . . . .  With respect to the second goal, the Supreme Court stated that "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.  A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis." . . . .

> The Court has also held that "the degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment." . . . .  A more stringent test applies if the provision interferes with constitutional rights, and a less stringent test applies if the provision concerns civil rather than criminal penalties. . . . .

*Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007) (internal citations omitted).

Here, the challenged measures lack any rational basis, are arbitrary, capricious, and vague, have no real or substantial relation to the objectives of the order, and are a palpable

invasion of rights secured by fundamental law in violation of the Due Process Clause of the Fourteenth Amendment.  (FAC ¶ 71).  The challenged measures are not simply suggestions— they are mandates that carry criminal penalties.  There is no rational basis for permitting individuals to travel to purchase pet supplies, Lotto tickets, marijuana, or liquor, but then prohibiting individuals from travelling to purchase firearms or to visit their own cottages within the State.  There is no rational basis for permitting out-of-state residents to travel to their cottages within Michigan but prohibiting Michigan residents to travel to their cottages within the State. There is no rational basis for designating and thus permitting some businesses as essential or critical infrastructure to operate—businesses such as pet stores, marijuana retailers, and liquor stores—but prohibiting firearms retailers or businesses that can operate safely, such as landscaping businesses.  There is no rational basis for permitting "places of worship" to operate or permitting individuals to gather for recreational purposes or for shopping at a hardware store but prohibiting immediate family members to meet at their private homes to pray or gather as a family.  There is no rational basis for the "stay at home" order—which feels like a house arrest.[18] Indeed, these restrictions, which carry criminal penalties, are exceedingly vague and the below stated exceptions "impermissibly delegate[] basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis":

> 1.  *To engage in outdoor physical activity*, consistent with remaining at least six feet from people from outside the individual's household.  Outdoor physical activity *includes walking, hiking, running, cycling, kayaking, canoeing, or other similar physical activity*, as well as any comparable activity for those with limited mobility.
>
> \* \* \*
>
> 6.  To *obtain necessary services or supplies* for themselves, their family or household members, *their pets*, and their vehicles.

---

[18] For these reasons, the restrictions also violate the Equal Protection Clause of the Fourteenth Amendment.  (*See infra* sec. III.D. 4.).

As recently stated by the Sixth Circuit:

> [W]e agree that no one, whether a person of faith or not, has a right "to expose the community . . . to communicable disease." *Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944).  But restrictions inexplicably applied to one group and exempted from another do little to further these goals and do much to burden religious freedom.  Assuming all of the same precautions are taken, why can someone safely walk down a grocery store aisle but not a pew?  And why can someone safely interact with a brave deliverywoman but not with a stoic minister?  The Commonwealth has no good answers.

*Roberts*, 2020 U.S. App. LEXIS 14933, at *10.

In the final analysis, the challenged measures are arbitrary, irrational, and vague in violation of the Fourteenth Amendment.

## 2.    Due Process—Right to Travel.

Travel bans are not immune from challenge during this current pandemic.  *See Roberts*, No. 2:20cv054 (WOB-CJS), 2020 U.S. Dist. LEXIS 77987, at *14 (preliminarily enjoining the Kentucky governor's travel ban).  "[T]he Due Process Clause of the Fourteenth Amendment protects the 'right to travel locally through public spaces and roadways.'"  *Cole v. City of Memphis*, 839 F.3d 530, 535 (6th Cir. 2016) (quoting *Johnson*, 310 F.3d at 495).  To determine what degree of scrutiny to apply, the court looks to the severity of the restriction, comparable to First Amendment free speech tests.  If a travel restriction regulates the time or manner of access to a place, it is subject to intermediate scrutiny.  *Id*. at 537.  If it broadly limits access, *as in this case*, it is subject to strict scrutiny.  *Id*.

In *Cole*, a statute cleared the streets in a two-block radius for two hours on weekend mornings and after special events.  *Id*. at 538.  The court determined that this was a narrow place restriction subject to intermediate scrutiny.  *Id*.  Because the city failed to show any conditions or potential conditions for the sweep during the specified times, the ordinance failed intermediate scrutiny.  *Id*. at 539.

In *Johnson*, an ordinance prohibited individuals from entering certain drug-exclusion zones for up to 90 days if an individual was arrested or taken into custody in one of the zones for a drug related offense. *Johnson*, 310 F.3d at 487. Because the ordinance broadly prohibited individuals' access to entire neighborhoods, the court applied strict scrutiny. *Id*. at 502. The court determined that the ordinance failed strict scrutiny because it broadly prohibited access to a large metropolitan district regardless of the reason for travel (it excluded innocent travel and travel to obtain drugs). *Id*. at 503.

Here, the executive order's overly broad travel restriction cannot survive strict scrutiny, the highest level of scrutiny under the law, particularly in light of the exceptions permitted. *See Lukumi*, 508 U.S. at 547. As noted, Plaintiff Beemer could travel to Charlevoix to purchase a Lotto ticket or alcohol, but she couldn't travel to her own property (her cottage). Plaintiff Muise could travel to purchase goldfish food, but it was a crime for him to travel to a gun store to purchase a firearm or ammunition. On its face, the travel restriction was exceedingly broad and disturbingly close to house arrest. Per the challenged restriction, excluding the few exceptions, "[a]ll other travel is prohibited." (FAC ¶ 26). Under the challenged restriction, persons were not able to travel between residences within the State (*e.g.,* children living on their own couldn't visit their parents and vice versa). Yet, individuals could travel from Toledo, Ohio and cross the entire State to go to their cottages in the Upper Peninsula, and individuals could travel from New York City, the epicenter of the virus in the United States, and go to their cottages in Charlevoix. The restriction was broad, irrational, and clearly fails to satisfy strict scrutiny.

The restriction fails intermediate scrutiny as well. The Sixth Circuit's ruling in *Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011), illustrates the point. In *Saieg*, the court struck

- 34 -

down a content-neutral restriction on leafletting, applying intermediate scrutiny and concluding as follows:

> Even though the leafleting restriction is content neutral and might provide ample alternative means of communication, the policy is not a reasonable time, place, and manner restriction.  Within the inner perimeter, *the restriction does not serve a substantial governmental interest, as evidenced by the defendants' willingness to permit sidewalk vendors and ordinary pedestrian traffic on the same sidewalks where they prohibited Saieg from leafleting*.

*Id.* at 740-41 (emphasis added); *see also McCullen v. Coakley*, 573 U.S. 464, 495 (2014) ("To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier.").  The same is true here.  The challenged restriction fails intermediate scrutiny because it does not serve a substantial government interest as evidenced by Defendant Whitmer's willingness to make numerous and irrational exceptions to the restrictions and by failing to consider alternatives that would have taken into account regional differences, as just one example.

### 3.   Due Process—Right to Property.

Plaintiff Beemer owns real property in Michigan—her cottage in Charlevoix County.  *Logan v. Zimmerman Brush Co*., 455 U.S. 422, 430 (1982) ("The hallmark of property . . . is an individual entitlement grounded in state law.").  The challenged measure prohibiting Plaintiff Beemer from travelling from her home in Saginaw, Michigan to her cottage deprived her of her cognizable property interest in the quiet use and enjoyment of her real property in violation of the Fourteenth Amendment.  *See Arill v. Maiz*, 992 F. Supp. 112, 117 (D.P.R. 1998) (holding that the complaint fully alleged a due process claim under § 1983 based on the deprivation of a cognizable property interest in the plaintiffs' quiet use and enjoyment of their property); *cf. Med Corp., Inc. v. City of Lima*, 296 F.3d 404, 412 (6th Cir. 2002) ("'Deprive' in the due process

clause cannot just mean 'destroy.'  If the state prevents you from entering your house it deprives you of your property right even if the fee simple remains securely yours.  A property right is not bare title, but the right of exclusive use and enjoyment.") (citation omitted).

### 4. Equal Protection.

When the government treats an individual disparately "as compared to similarly situated persons and that such disparate treatment . . . *burdens a fundamental right*, targets a suspect class,[19] or *has no rational basis*," such treatment violates the equal protection guarantee of the Fourteenth Amendment.  *Bible Believer,* 805 F.3d at 256 (internal quotations and citation omitted) (emphasis added).  "In determining whether individuals are 'similarly situated,' a court should not demand exact correlation, but should instead seek relevant similarity."  *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 987 (6th Cir. 2012) (internal quotation marks omitted).

As set forth above, the challenged measures burden fundamental rights under the First (expressive association and free exercise of religion), Second (right to bear arms), and Fourteenth (right to association and right to travel) Amendments in violation of the equal protection guarantee of the Fourteenth Amendment.  As just one example of disparate treatment, pet owners could travel to a pet store (an "essential" business) to purchase cat litter, but Plaintiff Muise could not travel to a gun store (a "non-essential" business) to purchase a firearm or ammunition.  That same pet owner could travel from Saginaw to Charlevoix to purchase goldfish food, but Plaintiff Beemer could not travel from Saginaw to Charlevoix to use and enjoy her own

---

[19] This is not a case involving discrimination based on a suspect classification.  Defendants' arguments on this point are irrelevant.  (*See* Gov. Br. at 39; Mackie Br. at 22-23).  And Defendant Mackie's assertion that "the Amended Complaint does not identify the fundamental rights supposedly at issue . . . or the similarly-situated  persons who supposedly received more favorable treatment" (Mackie Br. at 22-23) is demonstrably false.  (*See supra*).

private property—her cottage.  The Equal Protection Clause does not permit such disparate and

irrational treatment that burdens Plaintiffs' fundamental rights (and there is no fundamental right

to purchase pet supplies, Lotto tickets, alcohol, or marijuana).  In sum, the challenged measures

lack any rational basis and harm Plaintiffs' protected interests in violation of the Equal

Protection Clause of the Fourteenth Amendment.

Respectfully submitted,

AMERICAN FREEDOM LAW CENTER

/s/ *Robert J. Muise*
Robert J. Muise, Esq. (P62849)

/s/ *David Yerushalmi*
David Yerushalmi, Esq. (Ariz. Bar No. 009616;
DC Bar No. 978179; Cal. Bar No. 132011;
NY Bar No. 4632568)

*Attorneys for Plaintiffs*

- 37 -

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULES

I hereby certify that this brief contains 11,981 words, exclusive of the case caption, cover sheets, any table of contents, any table of authorities, the signature block, attachments, exhibits, and affidavits, and is thus within the word limit allowed under Local Civil Rule 7.2(b)(i) and this Court's order permitting Plaintiffs "to file one brief not to exceed 12,000 words in response to Defendants' motions to dismiss" (Doc. No. 39).   The word count was generated by the word processing software used to create this brief: Word for Microsoft Office 365, Version 1904.

AMERICAN FREEDOM LAW CENTER

*/s/ Robert J. Muise*
Robert J. Muise, Esq.

**CERTIFICATE OF SERVICE**

I hereby certify that on June 15, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the court's electronic filing system.  Parties may access this filing through the court's system.  I further certify that a copy of the foregoing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically: None.

AMERICAN FREEDOM LAW CENTER

/s/ *Robert J. Muise*
Robert J. Muise, Esq.